**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **LINDA F. NORMAN,** | ) | **CASE NO. 8:04CV221** |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| **KELLOGG USA, INC., a Michigan corporation,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Kellogg USA, Inc. ("Kellogg")(Filing No. 32). Kellogg has submitted a brief, reply brief, and evidence in support of its motion, and Plaintiff Linda F. Norman has submitted a brief and evidence in opposition. For the reasons that follow, I conclude that there are no genuine issues of material fact that preclude entry of summary judgment in favor of Kellogg.

**FACTS**

Plaintiff Linda Norman began her employment with Kellogg USA in December 1987, when she was hired to work in the company's Battle Creek, Michigan, plant. In 1995, she was transferred to the Omaha, Nebraska, plant where she continued to work for Kellogg until her employment was terminated on September 18, 2002. (Filing No. 33, Ex. 3, hereafter "Norman Dep." at 11:8-13). During her employment at the Omaha plant, Norman received a handful of disciplinary warnings for absenteeism and tardiness; two warnings related to sleeping on the job; a warning for reading unauthorized material on the job; and a "final" warning for insubordination in October 2001. (Filing No. 33, Ex. 1, hereafter "Muth Aff." at ex. F, "Personnel File" at page 13). On September 18, 2002, she was discharged for falling asleep on the job in a concealed location during her September 11, 2002, shift.

In her Complaint, Norman alleges that she was not asleep on the job. She claims that she was terminated for illegal, discriminatory reasons based on her sex. Norman also alleges that even if she had fallen asleep and was discharged for that reason, her termination constitutes illegal discrimination on the basis of her sex because the discipline meted out to male employees who fell asleep on the job was less severe than discharge.

Norman states that on September 11, 2002, she began to feel ill before she went to work, but she decided to go to work to make sure that the shift was adequately staffed. (Norman Dep. 57:3-58:2). After she arrived at work, she reached the conclusion that her shift was adequately staffed, and she asked for her supervisor's permission to leave. He never gave her permission to leave. (*Id.* at 58:3-22). She worked from approximately 11:00 p.m. to 3:20 a.m. before the incident that is the subject of the Complaint occurred.

According to Norman, she had her supervisor's standing permission to leave her post for her lunch breaks even when a co-worker failed to relieve her.[1] Therefore, on September 11, 2002, even though no one had relieved her, Norman left her post for her lunch break, and she sat down on some oil pads that were ordinarily kept "right next to" her work station. (*Id.* at 59:4--62:2). She felt ill. Because her head and neck were aching, she lay atop the pads for "a couple of minutes." (*Id*. at 61:16-22, 63:6-8). Norman states that she was not sleeping, though she concedes that she had closed her eyes. (*Id*. at 63:9-13). In her brief in opposition to Kellogg's motion, she "admit[s] that someone seeing her in that position might think she was sleeping." (Filing No. 36, p. 5, *Id.* at 63:9-10). Norman did not hear the foreman and supervisor when they approached her or when the digital

---

[1] Norman's supervisor, Arnold Virlacher, told Norman that if John Bernady, the employee who was supposed to relieve her for breaks, did not relieve her that she could go ahead and take her breaks. (Norman Dep. at 85:19-86:16).

photograph - complete with flash - was taken of her in the sleeping position. She claims that she was unable to hear them, not because she was asleep, but because she had earplugs in because the plant is so noisy. Norman said she jumped up when she heard them banging on the steel panel by her head. (Norman Dep. 63:13-19).

Kellogg's version of the events is not materially different from Norman's version. Todd Erisman was Norman's immediate supervisor on September 11, 2002. Erisman stated that he was alerted to the fact of Norman's sleeping and to her location by a plant foreman, Scott Dillon. (Filing No. 33, Ex. 2, hereafter "Erisman Aff." at ¶2.) It appears that Dillon first observed Norman sleeping at 3:21 a.m.. (Norman Dep. 65:20-24). Dillon then contacted Erisman. Erisman observed Norman in the sleeping position with her eyes closed. Erisman took a photograph of Norman. Erisman believes that Norman was sleeping. (Erisman Aff. at ¶ 3, and Ex. G). After Erisman photographed her in the sleeping position from a catwalk above the area, Norman jumped up from her position at 3:26 a.m.. (Norman Dep. 65:20-24). Erisman immediately suspended Norman pending an investigation and a meeting with William Muth that was scheduled for the following day. (*Id.*)

Kellogg's Omaha plant manager, Virgil Thomas, made the decision to terminate Norman's employment on the recommendation of William Muth. (Filing No. 33, Ex. 5 hereafter "Thomas Dep." at 9-20) Muth, who was then employed as a human resources generalist at the Omaha plant, was alerted to Norman's suspension by Erisman when Muth came to work on September 12, 2002. Muth and Erisman conducted the company's investigation into the incident. (Filing No. 33, Ex. 4, hereafter "Muth Dep." at 16-21).

Muth explained that when Thomas became the plant manager in 2002, he was concerned that internal plant rules were being disregarded, and, as a result, productivity was suffering. (Filing No. 33, Ex. 1 hereafter "Muth Aff." ¶¶ 4 and 5; Muth Dep. at 63-66). The Omaha plant implemented a plan to revive enforcement of the Kellogg USA personnel rules that were already part of the Kellogg's People Handbook for the Omaha plant. (Filing No. 33, Muth Aff. at Exs. A - C; Muth Dep. at 25-19-26:1; Thomas Dep. 20:24-22:2). This initiative was referred to as the "Back to the Basics" plan. In July 2002, management met with the supervisors to inform them of the initiative, and the supervisors were instructed to share the information with the persons whom they supervised. (Muth Aff. at Ex. B). The purpose was to notify employees that the existing rules would be enforced following a two-month grace period in which all the employees would receive reminders and warnings regarding the policies. (Muth Dep. at 63:13-69:8).

The People Handbook contains a discipline section in which certain examples of misconduct are categorized in "Groups," with "Group 1" referred to as the "Zero Tolerance Violations." For Group 1 violation, the Handbook states:

> Some problems are so serious that the first violation would probably call for discharge. The employee would be suspended, their identification badge swiped out, and notified later when the hearing would be held. Such problems include but are not limited to:    . . .
>
>     3.  Deliberate sleeping or concealment while on duty.

(Muth Aff. at Ex. C at KUSA 11 and 12; Muth Dep. at 25:19-26:17).

In its enforcement, Thomas and Muth agreed that Kellogg imposed a more severe sanction for "concealment" than for "deliberate sleeping." Those employees who were discovered sleeping in a concealed manner would be terminated, and those employees who were discovered sleeping in the open would be suspended. (Thomas Dep. 33:7-14;

4

Muth Dep. 26:18-28:2). Muth stated that he explained this distinction to the union stewards on more than one occasion. (Muth Dep. 28:9-13; 30:3-5; 65:9-69:8; Thomas Dep. at 32:18-33:6). Muth explained that "deliberate sleeping would include a person who has fallen asleep on the job on the line," and would include "nodding off." (Muth Dep. 26:18-27:1). "Concealment" is sleeping in an area hidden from open view. Muth explained that Kellogg treated these kinds of violations differently, because, in his experience, labor arbitrators view concealed sleeping as a more egregious violation than open sleeping. Consequently, a company's termination decision would more likely be upheld if it was for a concealed sleeping violation. (Muth Dep. 27:1-29:18). Muth stated that the facts of each case dictated whether a sleeping violation was treated as in-the-open or concealed. (Muth Dep. 27:24-25; *see also* Thomas Dep. at 24:7-25:2; 26:14-22).

Thirteen persons were disciplined by Kellogg for sleeping on the job from July 2002, after the expiration of the grace period for the Back to the Basics plan, through April 11, 2003. (Muth Aff. ¶¶ 10-13).[2] Of those thirteen persons, eight male employees received brief suspensions varying in duration from a partial-day suspension to a few days, (*id.* at ¶10); one male employee received a three-week suspension, the length of which appears to have been dictated by the amount of time Kellogg took to investigate and conclude that the employee's sleeping should be treated as in-the-open, (*id.* at ¶11); one male employee was permitted to resign in lieu of discharge based on a second sleep-related violation when

---

[2] In opposition to the Defendant's motion, Norman offers a record showing those employees who were disciplined for sleeping violations at the Omaha plant from 2002-2005. (Filing No. 37, Ex. 8). From that document and the employees' names, it appears that after April 11, 2003, an additional seven persons were disciplined: two female employees and five male employees. One of the males was terminated, apparently for repeated sleeping offenses and being under the influence, and one female was suspended and then issued a final warning for a second offense. The other five received suspensions. The document is not supported by an affidavit, and there is no evidence that these disciplinary matters were treated differently with regard to the open/concealed distinction than the thirteen offenses that are explained in Muth's affidavit.

5

he was found sleeping in the open,  (*id.* at ¶12); and two male employees and one female employee were discharged. *(See also* Filing No. 37, Ex. 8).

One of the male employees who was discharged, Andrew Miller, was found sleeping inside an air-handling unit. (Muth Dep. at 81:1-7). Kellogg considered this to be concealed sleeping, and it terminated his employment on November 15, 2002.  (*Id.* at 80:20-25). Miller grieved his termination, and the union represented that it intended to arbitrate. Because Miller was a 37-year employee of the company, because he had maintained an otherwise excellent work record, and because he had been honest throughout the investigation, Kellogg accepted the Union's settlement offer prior to the arbitration.  The settlement agreement allowed Miller to be reinstated to work following a lengthy, unpaid suspension, and he was required to sign a "last chance agreement" upon his return.  (*Id.* at 81:8-82:16; see also Muth Aff. ¶ 14 and Ex. E).

Former Kellogg employee Jerome Kazakevicius was discharged in February or March 2003, after he was found sound asleep on a pillow behind an HVAC unit at the Omaha warehouse.  (Muth Dep. 82:17-22; Muth Aff. ¶15 and Ex. E).  Although Kazakevicius filed a grievance protesting his discharge, the union did not prosecute the grievance and the discharge remained.  Kazakevicius argued that he had been ill the day of the offense,  he had been on his lunch break, and he did not appreciate the distinction between open and concealed sleeping, all of which were discussed by management and the union, but these arguments were not sufficient to change the discharge decision.  (*Id.* at 82:25 - 83:14; and Muth Aff. at ¶15 and Ex. E).

Linda Norman was found in an area that her supervisor and the foreman deemed to be in a concealed location.  She was lying on oil pads that were positioned - perhaps not

6

by her - between a large, blue steel panel (sometimes called an MCC panel) and a wall. While Norman described the location as "right next to" her work station, Muth estimated the location was 50 to 70 feet from Norman's work location.  (Muth Aff. at ¶17).  Norman readily admits that she had lain on a "rack" and closed her eyes.  (Norman Dep. at 63:6-10).  While she denies that she was sleeping, she conceded in her brief that someone looking at her then might have believed that she was sleeping.

## Summary Judgment Standard

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law.  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 322 (quoting Fed. R. Civ. P. 56(c)).  In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.*

Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.  *Whitley v. Peer Review Systems, Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000).

7

**DISCUSSION**

A prima facie case of sex discrimination requires the employee to present evidence of an adverse employment action brought on by the employer's discriminatory motive. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 927-928 (8th Cir. 2004). A plaintiff may prove discrimination in Title VII claims in two ways: with direct evidence as in the *Price Waterhouse* approach, or with indirect evidence as in the *McDonnell Douglas* analysis. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Because Norman has not produced any direct evidence of conduct or statements by persons involved in the decision-making process that indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision, her discrimination claim is subject to the burden-shifting method of proof first described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Kellogg contends that it is entitled to summary judgment because the Plaintiff is unable to satisfy her prima facie case under *McDonnell Douglas*, and, because she has no proof from which a trier of fact could conclude that Kellogg's stated reason for Norman's discharge was a pretext for illegally discriminating against her.

To present a prima facie case, Norman must show that she is a member of a protected class, that she was performing her job in a satisfactory manner prior to her discharge, that she was terminated, and that other employees who were similarly situated but not in the same protected group, were treated differently. If Norman is able to make a prima facie showing, Kellogg must proffer a legitimate, nondiscriminatory reason for her termination. "This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor." *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995). If Kellogg can satisfy that

burden of production, then Norman must present some evidence that Kellogg's stated reason is simply a pretext for sex discrimination.

There is no dispute that Norman is in a protected class and that she was terminated. Up until this episode, it appears that she was performing her job in a manner satisfactory to her employer, except as noted by the disciplinary memoranda contained in her personnel file. She contends that the discipline imposed on her for a violation of an internal plant rule, identified in the Handbook as a Group 1, item 3 offense, was more harsh than the discipline imposed on similarly situated male employees.

> The test to determine if one is "similarly situated" varies at each stage of a *McDonnell Douglas* analysis. At the prima-facie stage it is "not onerous," however at the third stage (proving pretext) it is "rigorous."

*Wheeler v. Aventis Pharmaceuticals*, 360 F.3d 853, 857 (8th Cir. 2004)(citing *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir. 1994).

Considering the low threshold at the prima-facie stage, I conclude that Norman has established each requisite element of her prima-facie case. The undisputed facts showed that several employees were disciplined for violating Kellogg Omaha plant's rule against sleeping, and that different sanctions were imposed. The burden shifts to Kellogg.

Kellogg has come forward with a legitimate, nondiscriminatory reason for imposing discharge upon Norman and suspension on several of the male employees who were found asleep on the job – a Group 1, item 3 violation. Muth described the difference in the treatment of the two disciplinary matters that arise under the same rule. When employees in Kellogg's Omaha plant are caught sleeping in the open, then they are suspended; when they are caught sleeping in a concealed manner, then they are discharged. Of the thirteen employees who have been disciplined since the Back-to-the-

Basics grace period expired and before April 11, 2003, all but Norman are male. Of the thirteen, all but three were determined to have been sleeping in the open, and all of them received suspensions, except for Samuel Ennis who was terminated because he had previous sleeping offenses in his record. (Muth Aff. ¶12). Of the persons who were found to have been sleeping in a concealed manner, all three were discharged by the company. The policy, the reasons for it, and Kellogg's enforcement of its provisions, as outlined above, demonstrate that Kellogg had a legitimate, nondiscriminatory reason for discharging Norman. Accordingly, Norman must bear the burden of coming forward with evidence of pretext.

I find that Norman has failed to produce any evidence that the company's stated reason for her discharge is only a pretext to cover up illegal discrimination against her on the basis of her sex. In her brief in opposition to the motion, Norman asserts that there are three genuine issues of material fact that preclude summary judgment. First, Norman states that she was not sleeping. (Norman Dep. 59:1-16). Whether Norman was sleeping or not is not material given that Norman admits that she lay down to rest, that she closed her eyes, that she was observed in that position for approximately five minutes, and that she did not get up until she heard the supervisor pound on the steel panel next to her. (Norman Dep. 59:4-63:19). There is no dispute that Erisman observed Norman in the sleeping position with her eyes closed. Erisman believed that Norman was asleep. (Erisman Aff. ¶ 3). He observed that she was concealed, having wedged herself between a 10-15 foot blue steel "MCC" panel and the wall. He suspended her based on his observations. Even Norman, in her brief, conceded that she may have looked like she was asleep.

Second, Norman argues that she was not concealed. However the undisputed evidence demonstrates that she was concealed. Exhibit G to Todd Erisman's Affidavit, Erisman's sworn statement, and Norman's deposition testimony belie her argument. The photograph taken of Norman, the authenticity of which has not been questioned, shows Norman in a sleeping position, nestled between the blue steel panel and a wall. The photograph was taken from a perspective above Norman. Erisman, who took the picture, stated that he took the picture and he described Norman's location. When Norman was asked in her deposition whether someone standing at her work station could have seen her, she answered, "I imagine. That's how they – they saw me. I imagine so." (*Id.* at 62:3-7). Her deposition response demonstrates that Norman did not know whether she was visible from her own work station, and that, at the time of the deposition, Norman did not know how her coworkers came to discover her.[3] The self-serving statement that Norman now makes, that she was not concealed, is insufficient to create a *genuine* issue regarding this material fact. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Third, Norman argues that summary judgment should not be granted because the reason for her termination is a mixed question of law and fact in that she believes employees who are sleeping while concealed must be treated the same as employees who are sleeping in the open because they are "similarly situated." (Filing No. 36, Plaintiff's Brief at 4). This argument ignores the undisputed evidence of Kellogg's legitimate reason

---

[3] Norman asks the Court to consider Exhibit No. 9 in opposition to the motion, for the assertion that she was not concealed. I agree with the Defendant that Plaintiff's Exhibit 9 should be stricken based on lack of foundation. I do not know who took the photographs, and there is no evidence that the photographs are true and accurate depictions of the location in which Norman was found. The Defendant's motion to strike will be granted.

for discharging Norman. "For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the *same* offense and are disciplined in different ways. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994)." *Wheeler*, 360 F.3d at 858 (emphasis added).

Norman has not been able to show that Kellogg treated similarly situated employees differently based on their sex. Though the applicable work rule covers two separate violations, Kellogg explained the reason for its distinction between sleeping in the open and concealed sleeping. Kellogg's reason for discharging some and not others for a first offense is tied to the nature of the offense, and not to the sex of the offending employee.

Those employees who are similarly situated to Norman are Miller and Kazakevicius because they were fired based on sleeping in a concealed manner. Miller successfully pursued a grievance that was ultimately settled, in part, with his reinstatement. His case is easily and materially distinguishable from Norman's case. Miller had a nearly spotless employment record, 37 years of service, and the union was willing to arbitrate his discharge. Norman's employment record is far from spotless, and it includes two other sleeping violations from 1998. Although Norman had several years of experience with the company, 17 years of service (Muth Dep. at 18:1-4), the union was not willing to arbitrate her discharge. Kazakevicius had a good work record during his brief two-year service with the company. However, as in Norman's case, the union chose not to pursue the arbitration of his discharge. The reasons supporting his grievance were very similar to Norman's. Both Kazakevicius and Norman claimed that they were feeling ill and both were on their lunch breaks at the time they committed the rule violation. These reasons did not secure their continued employment or persuade the union to arbitrate, and both employees were

12

discharged. There is no evidence that Kellogg discharges some employees who have been found sleeping in a concealed manner, but not others, based on their sex.

The only other evidence of discriminatory animus that Norman has presented relates to Scott Dillon, the foreman who, from a catwalk, first observed her sleeping. Norman stated that Dillon "had it out for" her. (Norman Dep. at 66:15-22). She said that his motivation was caused by an incident in which she went to Dillon's supervisor to secure an excused absence from work, and in a subsequent meeting, Norman called him a liar. (*Id.*). In her opinion, Dillon discriminated against females by withholding permission for their excused absences while granting his permission to male employees for their excused absences. (*Id.* at 67:4-68:25) Norman's feelings about Dillon do not prevent summary judgment in favor of Kellogg because Dillon was not involved in the decision to discharge Norman. Although he was the first to observe Norman in the sleeping position, Norman's supervisor, Todd Erisman, also observed Norman in this position, and a photograph of her in the sleeping position exists.[4]

Erisman and Muth conducted the investigation. Muth talked with Norman on at least two occasions about the circumstances surrounding her suspension. Muth also talked with Norman's supervisors. He reviewed her personnel file. In addition to two prior sleeping violations from August 28, 1998, and November 8, 1998, Norman had a "final warning" from a supervisor for insubordination.[5] (Normand Dep. at 18, 20-22). She also

---

[4] With regard to Erisman, Norman states that she believes Erisman did not like her for some reason, but she has no evidence that he treated her differently from others because she is female. (Norman Dep. at 70: 9-71:12).

[5] I realize that Norman also contends that male employees would not have received a "final warning" for insubordination based on using profanity directed at a supervisor. I note, however, that based on the disciplinary record regarding Norman's insubordination, her use of profanity toward the supervisor was only a part of the incident, and Norman argued with and challenged the supervisor's authority, not only during the

13

had documented trouble with absenteeism and tardiness.[6]  She was disciplined for reading unauthorized material on the job.  (Muth Aff. at Ex. F).  This information factored into Muth's recommendation for discharge.

I conclude that three Kellogg employees were similarly situated in that they were found sleeping on the job in a concealed manner after the grace period for the Back-to-the-Basics program expired.  Norman was fired after she was found sleeping on a "pile of oil dry pads hidden behind a blue steel MCC panel and a wall" (Todd Erisman Aff. ¶3); Miller was fired after he was found sleeping in an air-handling unit; and Kazekevicius was fired after he was found sound asleep in the warehouse.  Unlike the nine male employees who were suspended for sleeping in the open, Norman left her work location to lie down.  The undisputed evidence is that Kellogg enforced its policy against sleeping on the job consistently following the implementation of the Back-to-Basics Program, giving suspensions to first-time offending employees who were caught sleeping on the job in the open and discharging first-time offending employees who were found sleeping on the job in a concealed manner.  (Muth Dep. at 32:22-34:21).  The only exception was made in the case of a 37-year employee who had an otherwise spotless employment record and for whom the union was willing to arbitrate.

I conclude Norman failed to produce any evidence to show Kellogg's explanation is unworthy of belief. There is nothing in the record to dispute Kellogg's evidence that there was a lawful, factual basis for Erisman's decision to suspend Norman and for Muth's and

---

incident but also during the disciplinary meeting that followed.  Personnel File at p. 13.

[6]  This "lively" record not only distinguishes her case from Andrew Miller's case, and it may have something to do with the union's reluctance to arbitrate her grievance.

Thomas's decision to terminate Norman's employment.  *See Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir. 1995).  Without some evidence of pretext, the entry of summary judgment in favor of Kellogg is appropriate.

## CONCLUSION

There is no evidence that Kellogg discharged Norman because of her sex.  Kellogg management and its human resources personnel made a distinction between sleeping on the job in the open and sleeping on the job in a concealed manner.  Kellogg has explained the reason for the policy, the reason for the distinction in discipline, and the efforts it took to communicate the policy to its supervisors and the union stewards.  Kellogg has provided undisputed evidence regarding the disciplinary measures imposed for employees' sleeping on the job.  Norman has failed to provide any evidence of sex discrimination in the promulgation of the policy or its implementation.  Accordingly, I conclude that Kellogg is entitled to summary judgment in this case.

IT IS ORDERED:

1) The Defendant Kellogg USA, Inc.'s Motion for Summary Judgment (Filing No. 32) is granted; and

2) A separate judgment will be entered.

Dated this 28th day of April, 2005.

BY THE COURT:

s/Laurie Smith Camp
Laurie Smith Camp
United States District Judge